UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDRES ESPINDOLA,<br><br>                    Petitioner,<br><br>            v.<br><br>MARTIN GAMBOA,<br><br>                    Respondent. | Case No. 1:21-cv-01255-JLT-CDB (HC)<br><br>**FINDINGS AND RECOMMENDATION TO DENY PETITION FOR WRIT OF HABEAS CORPUS AND DECLINE TO ISSUE CERTIFICATE OF APPEALABILITY**[1]<br><br>**14-DAY DEADLINE**<br><br>(Doc. 13) |

On September 13, 2021, Petitioner Andres Espindola ("Petitioner"), a state prisoner proceeding pro se, filed an Amended Petition for Writ of Habeas Corpus alleging a single ground for relief ("Petition"). (Doc. 13). On November 5, 2021, Respondent filed an answer (Doc. 20), arguing Petitioner was not entitled to habeas relief, and lodged the state court record in support (Docs. 21, 21-1 through 21-18). After receiving an extension, Petitioner filed a traverse on December 13, 2021. (Doc. 26; *see* Doc. 24). For the reasons set forth below, the undersigned recommends that the district court deny the Petition and decline to issue a certificate of appealability.

---

[1] This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302(c)(17) (E.D. Cal. 2022).

## I. PROCEDURAL AND FACTUAL BACKGROUND

A jury in the Tulare County Superior Court found Petitioner guilty of second degree murder and found true a special allegation that Petitioner personally used a deadly or dangerous weapon. (Doc. 21-4 at 2; Doc. 21-15 at 105-06).[2] The court sentenced Petitioner to 15 years to life on the murder conviction, with an additional one-year term for the personal weapons use enhancement, to be served after Petitioner completed a determinate term in a separate case. (Doc. 21-4 at 2).

On appeal, the Fifth Appellate District Court of Appeal summarized the pertinent facts of the underlying offenses:[3]

> On January 14, 2006, Espindola stabbed Raymond Randle in the thigh, severing his femoral artery and killing him. The killing happened after a number of escalating encounters one afternoon between Espindola and individuals who lived in the apartment complex where Randle's girlfriend, K.B., lived.
>
> Around noon that day, Espindola had tried to break into Candice C.'s vehicle parked outside K.B.'s apartment, while Candice was visiting her. Marshall O., one of K.B.'s neighbors, saw Espindola looking into Candice's car and asked him if the car was his. Espindola responded, "You don't know me," and "Don't fucking worry about it." When Marshall told Candice that someone was looking in her car, Candice went outside and confronted Espindola.
>
> Espindola claimed to be looking for some "sounds" that had been stolen from him and said, "The bitch that drives this car stole [them]." He got into an argument with Candice, and Candice eventually opened her car and showed Espindola they were not his. Espindola said, "Oh, this ain't mine," and shook Candice's hand. Espindola went across the street to his apartment, then came back again. He tried to open the gate that led to K.B.'s apartment building, saying he wanted to go upstairs to his friend Joey's apartment. When he did that, he pushed the gate and it hit Candice's four-year-old son. Espindola also taunted Marshall with kissing sounds, threatened to beat him up, and told him to come outside so they could handle things. Joey told Espindola, "[Y]ou can't come over here if you'll be bringing that type of drama over here." Espindola left the building and went back across the street.
>
> Espindola returned, but K.B. and Marshall barred his entry at the gate to the apartment complex. Espindola said he wanted to go upstairs to "Shanae and Joey's house." K.B. and Candice told

---

[2] Record citations herein are to the CM/ECF-assigned pages.

[3] These facts are entitled to a rebuttable presumption of correctness. *See* 28 U.S.C. § 2254(e)(1); *Crittenden v. Chappell*, 804 F.3d 998, 1011 (9th Cir. 2015).

Espindola to leave and called the police. When police arrived, they contacted Espindola, who admitted to drinking, but was cooperative and responsive to the officers' requests and instructions. Espindola told them he was there visiting a friend. Around the same time, Joey came out of his upstairs apartment and told officers that Espindola was his friend. As the officers left, they saw Espindola walking upstairs and into Joey's apartment.

About 15 minutes later, another one of K.B.'s neighbors, Jesse G., was walking to his mailbox. Espindola was back outside again in the parking lot arguing with people. He confronted Jesse and said, "Why are you mad-dogging me?" When Jesse told him he had just come outside to put a letter in the mailbox, Espindola swung and punched Jesse. Espindola's brother-in-law, who lived across the street, came running over, and Jesse told him Espindola had sucker punched him. The brother-in-law tried to pull Espindola back to the other side of the street, as did Espindola's sister, who pulled on his shirt and told him to leave. Espindola tried to break free, and Jesse and he said to each other, "I know where you live."

Around that time, Randle drove up, along with his friend Adrian S. Randle arrived because Candice had told Randle over the phone that "there's some dude messing over here tripping." Randle was about six feet tall and 240 pounds. Espindola, Jesse, Marshall, and Marshall's friend J.J.F. were all in the street, talking and arguing. Randle got out of his car, told Marshall to get the neighborhood kids inside, and told K.B. to go inside. He was telling people to calm down, and some people heard others yelling, "Kick his ass." Adrian described the scene as "chaos, people running around, screaming, yelling."

When Randle asked Espindola what was going on, Espindola threatened to shoot him and said Randle was "too big." Espindola said to Randle, "I got something for you." According to one witness, Espindola and Randle "tussled [or] fought for a little bit," and Espindola then turned and ran 70 feet down the street to a white Taurus, where he opened the trunk, looked through it for approximately 30 seconds to a minute, took something out of it (hidden in a beanie), and ran back across the street to where Randle was standing in the road. Other witnesses testified Espindola and Randle did not fight before Espindola went to the car. In the confusion, some people thought Espindola had a gun.

In the meantime, Randle and Adrian had discussed using a "pincer" move to take Espindola down if he had a weapon when he returned, meaning that they would approach him from different angles. But Adrian "reacted too slow" and was not able to get a different angle on Espindola before Randle and Espindola met in the middle of the street.

Many witnesses testified about the fight that ensued. According to Adrian, Randle walked swiftly toward Espindola, lunged at him, and grabbed at Espindola's shoulder. Another witness claimed Randle and Espindola "went at each other"; when Espindola returned from the trunk of the car, he "ran up on Raymond," who

3

>pushed Espindola back. According to Candice, when Espindola returned with the knife, Randle and Espindola "met in the middle of the street." Candice said Espindola "walked fast" toward Randle and that Randle grabbed Espindola's hands. Marshall said Espindola "jog[ged] back and lunged at Randle." K.B., who was Randle's girlfriend, could not remember whether Randle or Espindola grabbed the other first. According to Jesse, Espindola lunged at Randle.
>
>After Randle and Espindola engaged, Randle grabbed Espindola and put him in a headlock using his right arm, and used his other arm to grab the hand where Espindola was holding the beanie and a hidden knife with an eight-to-nine inch blade. Jesse estimated Randle had Espindola in a headlock for about a minute, and Candice estimated they wrestled for about 30—45 seconds. Randle eventually lost his balance and his grip on Espindola's wrist, and when he did so, Espindola stabbed Randle in the left thigh.
>
>Randle pushed Espindola off him and began hopping on one leg. Espindola took a couple of steps back, looked at Randle, asked "Who wants some next?" or "Who else wants some?" He then turned around and ran toward the apartments across the street in the direction of the car from which he had retrieved the knife. A couple of men ran after him, but Espindola jumped a fence and was not seen again. He went to another country and did not return to the United States for 11 years.
>
>Meanwhile, Randle hopped on one leg back toward his car and the apartment complex. His left leg was bleeding profusely, so Jesse fashioned a tourniquet out of a belt around Randle's upper thigh. He and others applied pressure to Randle's wound. Medical personnel and police arrived, and they took Randle to the hospital, where he later died due to exsanguination (blood loss) from the stab wound. His femoral artery had been severed.

(Doc. 21-4 at 2-5). The appellate court affirmed Petitioner's convictions. (*Id.* at 16). On May 12, 2021, the California Supreme Court summarily denied review. (*See* Doc. 21-6).

Petitioner now presents a single ground for relief, arguing the trial court's failure to instruct the jury on the lesser included offense of involuntary manslaughter as requested by Petitioner was prejudicial error and deprived him of due process because it prevented him from presenting a complete defense. (Doc. 13 at 5-6).

## II.   STANDARD FOR FEDERAL HABEAS RELIEF

A federal court's statutory authority to issue habeas corpus relief for persons in state custody is set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). AEDPA requires a state prisoner seeking federal habeas relief to

first "exhaust[t] the remedies available in the courts of the State."[4] 28 U.S.C. § 2254(b)(1)(A). Where the state court adjudicates the claim on the merits, a petitioner is not entitled to habeas relief unless the adjudication (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Deciding whether a state court's decision 'involved' an unreasonable application of federal law or was 'based on' an unreasonable determination of the facts requires the federal habeas court to 'train its attention on the particular reasons—both legal and factual—why state courts rejected a state prisoner's federal claims." *Wilson v. Sellers*, 584 U.S. 122, 125 (2018). When the state court's decision "does not come accompanied with [its] reasons" for the decision, a federal court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale." *Id.* However, when there is no reasoned decision to "look through," it may be presumed—in "the absence of any indication or state-law procedural principles to the contrary"—that the state court adjudicated the claim on the merits and the petitioner must show "there was no reasonable basis for the state court to deny relief." *Harrington v. Richter*, 562 U.S. 86, 98-99 (2011).

Under § 2254(d)(1), a decision is "contrary to" clearly established federal law if the state court either: (1) applied a rule that contradicts the governing law set forth by Supreme Court case law; or (2) reached a different result from the Supreme Court when faced with materially indistinguishable facts. *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003). A state court decision involves an "unreasonable application" of the Supreme Court's precedents if the state court correctly identifies the governing legal principle but applies the facts of the petitioner's case in an objectively unreasonable manner, *Brown v. Payton*, 544 U.S. 133, 134 (2005), or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new

---

[4] The statute allows for limited exceptions inapplicable here. *See* 28 U.S.C. § 2254(b)(1)(B).

context where it should apply." *Williams v. Taylor*, 529 U.S. 362, 407 (2000). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 62 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The petitioner must show that the state court decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103.

Under § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). "State courts are accorded substantial deference. If reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's determination." *Marks v. Davis*, 106 F.4th 941, 949 (9th Cir. 2024) (citations and quotation marks omitted) (quoting *Brumfield v. Cain*, 576 U.S. 305, 314 (2015)).

### III. ANALYSIS

Petitioner's single ground for relief challenges the trial court's failure to instruct the jury on the lesser included offense of involuntary manslaughter. (Doc. 13 at 5-6).

**A. Background**

At trial, the court asked the parties their position on whether a jury instruction on involuntary manslaughter should be given. (Doc. 21-10 at 6). The prosecution's position was that such an instruction was not warranted because there was evidence of both express and implied malice, negating any requirement that the court instruct on involuntary manslaughter. (*Id.* at 7). Defense counsel disagreed, arguing the instruction was proper because the evidence supported "an unintentional death caused by [Petitioner's] action of holding the knife." (*Id.* at 8).

Ultimately, the trial court rejected the instruction, indicating there was not "substantial evidence that would warrant giving the involuntary manslaughter" instruction. (Doc. 21-11 at 10). The court explained:

6

> Certainly there may have been an imperfect self-defense, but if that's the case, it would reduce this issue to a voluntary manslaughter. We have more here than just all of a sudden a fight. We have a situation where it seems undisputed by the evidence that the defendant purposely went back to his vehicle, got that knife and came back. Wasn't done by accident.

(*Id.*). The court instructed the jury on the elements of first- and second-degree murder, voluntary manslaughter, and imperfect self-defense. (*Id.* at 39-45). The jury found Petitioner guilty of second-degree murder. (Doc. 21-15 at 106).

On appeal, Petitioner argued the trial court's failure to instruct on involuntary manslaughter was prejudicial error and deprived him of his right to present a defense. (*See* Doc. 21-1 at 15-33). In its opinion, the appellate court set forth the applicable standard of review for jury instructions:

> " 'The trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence, whether or not the defendant makes a formal request.' … 'That obligation encompasses instructions on lesser included offenses if there is evidence that, if accepted by the trier of fact, would absolve the defendant of guilt of the greater offense but not of the lesser.' … 'To justify a lesser included offense instruction, the evidence supporting the instruction must be substantial—that is, it must be evidence from which a jury composed of reasonable persons could conclude … "that the lesser offense, but not the greater, was committed." … "On appeal, we review independently the question whether the trial court failed to instruct on a lesser included offense." ' " (*People v. Souza* (2012) 54 Cal.4th 90, 115–116, citations omitted.)

(Doc. 21-4 at 7). The court then set forth the applicable law regarding the differences between second-degree murder, voluntary manslaughter, and involuntary manslaughter:

> "Second degree murder is the unlawful killing of a human being with malice aforethought, but without the additional elements required for first degree murder (e.g., willfulness, premeditation, and deliberation)." (*People v. Chavez* (2018) 22 Cal.App.5th 663, 682 (*Chavez*); § 187, subd. (a).) Malice may be either express or implied. (§ 188.) "Malice is express when a defendant manifests a deliberate intention to kill another person." (*Chavez,* at p. 682.)
>
> "Malice is implied when the killing of another person is proximately caused by an act, the natural and probable consequences of which are dangerous to life, which act was deliberately performed by a person who knows his or her conduct endangers the life of another and acts with conscious disregard for

7

> life." (*Chavez,* at p. 682.) Implied malice can be conceptualized as having both a physical and mental component. (*People v. Guillen* (2014) 227 Cal.App.4th 934, 984 (*Guillen*).) " ' "The physical component is satisfied by the performance of 'an act, the natural and probable consequences of which are dangerous to life.' [Citation.] The mental component is the requirement that the defendant 'knows that this conduct endangers the life of another and … acts with a conscious disregard for life.' " ' " (*People v. Bryant* (2013) 56 Cal.4th 959, 965 (*Bryant*).) In short, implied malice requires a defendant's awareness of engaging in conduct that endangers the life of another. (*People v. Cravens* (2012) 53 Cal.4th 500, 507 (*Cravens*).)
>
> In contrast to murder, manslaughter, which is a lesser included offense of murder, "is an unlawful killing without malice." (*People v. Elmore* (2014) 59 Cal.4th 121, 133 (*Elmore*).) There are three types of manslaughter: voluntary, involuntary, and vehicular. (*Ibid.*)
>
> "Two factors may preclude the formation of malice and reduce murder to voluntary manslaughter: heat of passion and unreasonable self-defense. [Citations.] Heat of passion is recognized by statute as a mitigating factor. [Citation.] Unreasonable self-defense is founded on both statute and the common law." (*Elmore, supra,* 59 Cal.4th at p. 133.) In contrast to voluntary manslaughter, involuntary manslaughter is a killing that occurs during the commission of "an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (§ 192, subd. (b).)

(*Id.* at 7-8).

Ultimately, the appellate court rejected Petitioner's argument because (1) there was not substantial evidence of the absence of malice to warrant an involuntary manslaughter instruction and (2) any error in failing to instruct the jury on involuntary manslaughter was harmless under *Chapman v. California*, 386 U.S. 18 (1967). (*Id.* at 11-15). Regarding the evidence, the court explained:

> Here, the evidence shows Espindola engaged in the type of aggravated assault the natural consequences of which are dangerous to human life, and that he subjectively appreciated the danger to human life his conduct posed and acted with a conscious disregard for life. He took a knife with an eight-to-nine-inch blade and stabbed it five- and-a-half inches into Randle's leg. This was a deep stab, not a slice or a shallow poke. There is no evidence the stab was an accident or a mistake. Indeed, the evidence is to the contrary. Before Espindola and Randle fought, Espindola called Randle "too big" and said he had "something for [him]" before going to the car trunk and obtaining the knife. The fight could have ended then, but Espindola decided to approach Randle again, this time armed with a knife hidden in a beanie. After the stabbing, Espindola stood back and asked, "Who else wants some?" before

8

running away, which further evidences this was no accident or mistake.

Additionally, the evidence showed the natural and probable consequences of the stab were dangerous to human life. Again, this was not a slice or a shallow poke, and it strains credulity to posit that an adult would not know that the natural and probable consequences of plunging a knife that deep into someone's upper leg are dangerous to life. Indeed, the use of a knife during any violent hand-to-hand altercation inherently poses a risk of fatal injury, which unfortunately occurred here. Espindola argues, without any citation to the record, that Randle would not have died but for the knife severing his femoral artery. However, that assertion has no support in the record—the coroner never testified to that—and we cannot gratuitously assume that for Espindola. Additionally, given the severity of the stab wound and Espindola's incendiary conduct before the fight, and callous conduct after, the evidence strongly demonstrates Espindola acted with a conscious disregard for Randle's life.

Espindola places emphasis on Adrian's testimony that Randle lunged at Espindola first, which, if believed, may make Randle look like the initial aggressor. However, the evidence shows that Randle and Adrian knew Espindola had something hidden in his hand, which they believed to be a weapon. Thus, the strong implication would be that, if Randle lunged at Espindola first, it was because Randle was being preemptively defensive. Espindola also stresses the fact he was in a headlock. However, there was no evidence presented that Espindola was losing consciousness or was otherwise in any kind of danger; nothing that would support a finding that he had a reasonable, though erroneous, belief in the need to act in self-defense. Rather, the evidence strongly indicates Randle placed Espindola in a headlock and grabbed his hand in an effort to prevent Espindola from using the knife as a weapon. In sum, we do not believe it would be possible for a rational jury to reach conclusions in Espindola's favor regarding these emphasized facts.

There is no credible evidence for a reasonable juror to find either that the natural and probable consequences of the stab were not dangerous to Randle's life or Espindola acted without consciously realizing the risk to Randle's life. Specifically, there was no evidence presented to support, either expressly or inferentially, that the knife stab was not highly dangerous to Randle's life, or that Espindola did not consciously disregard this risk. As we mentioned, this was no accident or mistake, nor was there any evidence to suggest Espindola did not understand that plunging a knife deeply into the upper leg poses a great risk of causing fatal bleeding. The trial court therefore properly refused to instruct on involuntary manslaughter based on its finding that the evidence of Espindola's malice was overwhelming and that therefore there was no substantial evidence to allow a reasonable jury to find that he was guilty of the lesser offense of involuntary manslaughter but not the greater offense of second degree murder. (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137 (*Millbrook*).)

|   |   |
|---|---|
| 1 | … |
| 2 | Based on this record, and considering the evidence in the light most favorable to Espindola, substantial evidence did not absolve him from guilt of the greater offense but not the lesser. (See *People v. Cole* (2004) 33 Cal.4th 1158, 1218.) The jury was not reasonably likely to have convicted Espindola of the lesser included offense of involuntary manslaughter had such an instruction been given. (See *People v. Thomas* (2012) 53 Cal.4th 771, 815.) As such, the trial court had no duty to give an instruction regarding involuntary manslaughter and this claim fails. (See *Guillen, supra,* 227 Cal.App.4th at p. 1028.) The trial court did not err in refusing to instruct on involuntary manslaughter. There was sound evidence Espindola stabbed Randle with implied malice, and there was no evidence from which a rational jury could find he acted without implied malice. More specifically, there is insufficient evidence to support a finding that either the natural and probable consequences of the stab were dangerous to Randle's life, or that Espindola acted without a conscious disregard for Randle's life. As explained previously, this conclusion disposes of both of Espindola's posited theories of involuntary manslaughter. |

(*Id.* at 11-13). Further, the court determined that any error in failing to instruct on involuntary manslaughter was harmless beyond a reasonable doubt, explaining:

> As noted above, this record does not establish or even reasonably suggest Espindola accidentally stabbed Randle. Moreover, the jury found true the enhancement that Espindola personally used a deadly weapon during the commission of this crime. To find this enhancement true, the jury was instructed Espindola must have intentionally displayed the weapon in a menacing manner or hit someone with the weapon. The jury's true finding negates any claim of an accident. Additionally, based on the severity of the stab considered in combination with the attendant circumstances and Espindola's behavior before and after the fight, we can declare beyond a reasonable doubt that any presumed instructional error was harmless. (*Chapman, supra,* 386 U.S. at p. 24.) Accordingly, prejudice is not present under either standard of review and this claim fails.

(*Id.* at 15).

**B. Arguments**

Petitioner argues the trial court erred in refusing to instruct the jury on involuntary manslaughter because "[s]ubstantial evidence shows that petitioner unintentionally killed Randal without a conscious disregard for life." (Doc. 13 at 34). Petitioner asserts that "Randall, a six-foot tall man who who [sic] weighed 240 pounds, had his arm wrapped around petitioner's neck in a 'headlock' for as long as a minute. Petitioner struggled, freed his hand from Randall's grip,

1   and stabbed Randall once, in his leg." (*Id.*). Based on this interpretation of the evidence,

2   Petitioner asserts a rational jury could conclude he committed involuntary manslaughter, not

3   murder. (*Id.*).

4   Respondent argues Petitioner is not entitled to habeas relief for multiple reasons. First,

5   Respondent argues "the Ninth Circuit has held that failure of a state court to instruct on a lesser

6   included offense in a non-capital case, such as this one, fails to present a federal constitutional

7   question." (Doc. 20 at 7 (citing *Solis v. Garcia*, 219 F.3d 922, 929 (9th Cir. 2000) (per curiam)).

8   Next, Respondent asserts "there is no clearly established federal law which holds that a petitioner

9   is entitled to a lesser included offense instruction in a non-capital case." (*Id.* at 8 (citing *United*

10  *States v. Rivera-Alonzo*, 584 F.3d 829, 834 n.3 (9th Cir. 2009)). Additionally, Respondent argues

11  "to find a constitutional right to a lesser included offense instruction in this non-capital case

12  would require the application of a new rule of law which this Court may not undertake in a

13  habeas proceeding." (*Id.* (citing *Teague v. Lane*, 489 U.S. 288 (1989)). Even if an error

14  occurred, Respondent argues the state court's conclusion that any error was harmless was not

15  unreasonable as required for Petitioner to be entitled to habeas relief. (*Id.* at 8-9).

16  In his traverse, Petitioner argues he has a constitutional right to present a complete defense

17  and the trial court's failure to give an involuntary manslaughter instruction deprived him of that

18  right. (Doc. 26 at 5-11). Petitioner asserts that he was entitled to the instruction because the

19  evidence shows he either "unintentional [sic] killed Randall in unreasonable self-defense without

20  a conscious disregard for life, or he unintentionally killed Randall during an inherently dangerous

21  assaultive felony without a conscious disregard for life." (*Id.* at 11-12).

22  **C. Analysis**

23  Based on the record before the Court, Petitioner cannot show that the state appellate

24  court's rejection of his claim was contrary to, or an unreasonable application of, clearly

25  established Supreme Court precedent, nor was it based on an unreasonable determination of the

26  facts.

27  First, Petitioner cannot establish a constitutional right to a lesser included offense

28  instruction. As the Ninth Circuit has explained, "[t]he right to an instruction on a lesser-included

11

1    offense derives from the common law and the Federal Rules of Criminal Procedure." *Rivera-*
2    *Alonzo*, 584 F.3d at 829 n.3.  While "[t]here is a constitutional due process right to a lesser-
3    included instruction in capital cases when the facts would allow the jury to impose a life sentence
4    rather than death," "there is no clearly established federal constitutional right to lesser included
5    instructions in non-capital cases." *Id.* (citing *Solis*, 219 F.3d at 929)); *see Reno v. Davis*, 46 F.4th
6    821, 833 (9th Cir. 2022) (recognizing a constitutional right to jury instructions on a lesser
7    included offense only in capital cases).  Accordingly, the Ninth Circuit has "long rejected" habeas
8    claims based on failure to instruct on lesser included offenses in non-capital cases "because the
9    United States Supreme Court has expressly left this issue undecided." *Luis v. Montgomery*, 698
10   F. App'x 530, 530-31 (9th Cir. 2017) (citing *Solis*, 219 F.3d at 928)); *see Kopy v. Ryan*, 319 F.
11   App'x 666, 669 (9th Cir. 2009) ("Moreover, the failure of a state trial court to instruct on lesser
12   included offenses in a non-capital case generally does not present a federal constitutional
13   question.").

14   To the extent Petitioner argues the refusal to instruct on involuntary manslaughter denied
15   him of his due process right to present a complete defense, such argument also fails.  "The
16   Supreme Court has held that as a general proposition, a defendant is entitled to an instruction as
17   to any recognized defense for which there exists evidence sufficient for a reasonable jury to find
18   in his favor." *Bradley v. Duncan*, 315 F.3d 1091, 1098 (9th Cir. 2002) (citation modified)
19   (quoting *Mathews v. United States*, 485 U.S. 58, 63 (1998)).  Because a criminal defendant must
20   be afforded a meaningful opportunity to present a complete defense, failure to correctly instruct
21   the jury on a defense *may* deprive a defendant of due process if it prevented the jury from
22   considering the defense.  *Id.* at 1098-99.  Importantly, the instruction must be supported by the
23   evidence to have a right to the instruction.  *Cebrero v. Ndoh*, 853 F. App'x 159, 159-160 (9th Cir.
24   2021) (citing *Bradley*, 315 F.3d at 1098) (rejecting habeas claim based on failure to instruct on
25   duress because such an instruction was not supported by the evidence).

26   Here, the appellate court concluded the evidence did not support a lack of malice as
27   required for an involuntary manslaughter instruction to be proper.  (Doc. 21-4 at 11-13).  Multiple
28   witnesses testified that after the initial contact between Petitioner and the victim, Petitioner ran

from one location to another to get the knife out of his car before returning to the scene and again approaching the victim. (Doc. No. 21-9 at 34-36, 83-83; Doc. No. 21-9 at 20-21, 71, 116-17, 138). As the appellate court observed, "the use of a knife during any violent hand-to-hand altercation inherently poses a risk of fatal injury" such that Petitioner's actions in leaving the scene and returning with a knife—rather than fleeing the scene entirely to end the altercation—are indicative of a conscious disregard for life in support of malice. (Doc. 21-4 at 11-12). There was no other evidence negating the malice element. Thus, the evidence did not support giving an involuntary manslaughter instruction

Finally, even if an error occurred, Petitioner cannot show that he was prejudiced by the failure to instruct on involuntary manslaughter. *See Bradley*, 515 F.3d at 1099 (where court concluded failure to instruct on entrapment violated petitioner's due process rights, petitioner was only entitled to habeas relief if he could show prejudice). Petitioner argues the lack of an involuntary manslaughter instruction denied him a complete defense because his counsel was not able to argue that Petitioner acted without a conscious disregard for life. (Doc. 13 at 37). However, in instructing the jury, the trial court explained that Petitioner must have acted with malice aforethought to be guilty of either first- or second-degree murder, and defined implied malice as including, of relevance, that Petitioner "deliberately acted with conscious disregard for human life." (Doc. 21-11 at 41-42). During closing arguments, Petitioner's counsel argued Petitioner acted in self-defense, even if imperfect self-defense, and did not act with the requisite malice to support a murder conviction. (Doc. 21-11 at 92-99). By returning a guilty verdict on second degree murder, the jury rejected any argument that Petitioner did not act with malice. Additionally, the trial court instructed that for the personal use of a weapon enhancement to be found true, Petitioner must have intentionally displayed the weapon in a menacing manner or hit someone with a weapon. (Doc. 21-11 at 48). As the appellate court indicated, the jury's true finding on this enhancement indicates it rejected any claim of accident or lack of intent. (*See* Doc. 21-4 at 15). In other words, the jury's verdict indicates it rejected any argument that Petitioner did not act with malice and there is no reason to believe this conclusion would have differed if the court gave the involuntary manslaughter instruction.

13

1    For all these reasons, Petitioner is not entitled to habeas relief on his instructional error
2    claim. The undersigned recommends the petition be denied.

3    **IV.    CERTIFICATE OF APPEALABILITY**

4    "[A] state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a
5    district court's denial of his application." *Miller-El v. Cockell*, 537 U.S. 322, 335-36 (2003). Rule
6    11 of the Rules Governing § 2254 Cases requires a court to "issue or deny a certificate of
7    appealability when it enters a final order adverse to the applicant." A certificate of appealability
8    will issue "only if the applicant has made a substantial showing of the denial of a constitutional
9    right." 28 U.S.C. § 2253(c)(2). To make this showing for claims rejected on procedural grounds,
10   a movant must demonstrate "that jurists of reason would find it debatable whether the petition
11   states a valid claim of denial of a constitutional right and that jurists of reason would find it
12   debatable whether the district was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S.
13   473, 484 (2000). When a claim is rejected on the merits, the petitioner "must demonstrate that
14   reasonable jurists would find the district court's assessment of the constitutional claims debatable
15   or wrong" to warrant a certificate of appealability.

16   Because Petitioner has not made a substantial showing of the denial of a constitutional
17   right, the undersigned recommends that the court decline to issue a certificate of appealability.

18   **V.     RECOMMENDATION**

19   For the reasons set forth above, it is **RECOMMENDED**:

20   1. Petitioner be DENIED all relief on his Petition for Writ of Habeas Corpus (Doc. 13);
21      and
22   2. Petitioner be denied a certificate of appealability.

23   These findings and recommendations are submitted to the district judge assigned to this
24   action, pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 304 of the Local Rules of Practice for the
25   United States District Court, Eastern District of California. Within **14 days** of service, any party
26   may file written objections to these findings and recommendations with the Court and serve a
27   copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's
28   Findings and Recommendations" and **shall not exceed 15 pages** without leave of Court and good

cause shown.  The Court will not consider exhibits attached to the Objections.  To the extent a party wishes to refer to any exhibit(s), the party should reference the exhibit in the record by its CM/ECF document and page number, when possible, or otherwise reference the exhibit with specificity.  Any pages filed in excess of the 15-page limitation may be disregarded by the District Judge when reviewing the Findings and Recommendations under 28 U.S.C. § 636(b)(1)(C).  Failure to file objections within the specified time may waive the right to appeal the district judge's order.  *Wilkerson v. Wheeler*, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **July 14, 2025**                                   _____
                                                            UNITED STATES MAGISTRATE JUDGE